## Case No. 4,160.

### In re DUNKLE et al.

[7 N. B. R. 72.][1]

District Court, E. D. Pennsylvania. Nov. 15, 1870.

[1] [Reprinted by permission.]

By J. MASON, Register:

At an adjourned second general meeting of creditors in this matter, held before the register on the thirteenth day of June, eighteen hundred and seventy, the claims of Martin Dreisbach and Elizabeth Dreisbach, (a more particular statement of which will be set forth herein), alleging that by virtue of certain judgments recovered before the commencement of proceedings in bankruptcy, and executions issued thereon, they were entitled to the proceeds arising from the sale of the personal property levied on thereunder at No. 140 North Eighth street, Philadelphia, and which had come into the hands of the assignee, were presented by their counsel, Hon. James Pollock. The deposition, (previously taken,) of a deputy sheriff of the city and county of Philadelphia, was then read in support of said claims. Annexed to said deposition, as an exhibit, was a certified copy of the docket entries in a certain suit in equity in the circuit court of the United States for the eastern district of Pennsylvania, (Lewis Jones v. Oliver R. Dunkle and William Dreisbach, trading as Dunkle & Dreisbach, and Martin Dreisbach: October session, 1869, No. 7,) by which it appeared that an injunction had been granted until further order, upon notice of which the said deputy sheriff stated that the sale of the goods levied on by him under the execution referred to had been postponed from week to week until he had yielded possession to an officer of the United States court. The register stated that he was of opinion that the said claims could not be considered by the meeting while the injunction remained undissolved, or unless some order should be made by said circuit court, directing or allowing the investigation of the validity of the alleged liens, by virtue of said judgments and executions before him in this proceeding. To this decision the counsel for said claimants excepted, and requested the register to certify the question to the court, which was accordingly done.

On the fifteenth day of June, eighteen hundred and seventy, the following order was made by the said circuit court in the suit in equity referred to: "And now, eighteen hundred and seventy, June fifteenth, the defendants renew the motion to dissolve the injunction. The court holds the motion under advisement, making the order which was orally expressed at a former hearing, and should have been drawn up by the solicitors or counsel and filed of record, that is to say that the lien and right of priority of payment, (if any,) of the defendants in equity, as plaintiffs at law to the subject of the execution, as to which proceedings, having delayed by the injunction, shall not be prejudiced, but if the right of priority be sustained, it shall be available against and paid out of the proceeds in bankruptcy of the said subjects. The court is of opinion that unless the assignee in bankruptcy adopts prompt measures to become a party in and to prosecute the present writ in equity, the parties hitherto restrained therein should be relieved of the injunction. But this opinion may become inapplicable if these parties have advisedly elected or shall so elect to make their claim of priority under the proceedings upon the account now pending before the register. In the latter case he will provisionally hear the case, and, subject to exceptions, will report upon the rights of priority, &c." At an adjourned second meeting of creditors, held before the register on the twenty-third day of June, eighteen hundred and seventy, Messrs. Pollock and Orwig announced the election of said Martin Dreisbach and Elizabeth Dreisbach to make their claim of priority under the proceedings upon the account, &c., under the said order. Martin Dreisbach, one of the claimants, and other witnesses were examined at a number of adjourned meetings; the examination of the bankrupt, taken previously, at which Mr. Orwig, one of the counsel for said Martin Dreisbach, had been present and had an opportunity of cross-examining, being also considered in evidence. All the testimony taken being herewith forwarded. The funds in the hands of the assignee arising from the sale of the goods in the store of the bankrupt, No. 140 North Eighth street, in the city of Philadelphia, were claimed by said Martin Dreisbach and Elizabeth Dreisbach by virtue of the liens of the following executions issued out of the district court for the city and county of Philadelphia, prior to the commencement of the proceedings in bankruptcy, viz.: "Bush, Bunn & Co., for the use of Martin Dreisbach v. Dunkle & Dreisbach. Fi. fa. No. 684, September term. R. D. $554 80," by virtue of which the sheriff levied on all the personal property of defendants at No. 140 North Eighth street, in the city of Philadelphia, on the fifteenth day of October, eighteen hundred and sixty-nine, seven days before the petition in bankruptcy was filed against defendants. "Martin Dreisbach v. William Dreisbach. Fi. fa. No. 685, S. T., 1869. R. D. $8,570. D. S. B. No. 287, S. T., 1869. Interest from March 1st, 1869," by virtue of which writ the sheriff levied on all the personal property of defendant at the store No. 140 North Eighth street, on the fifteenth day of October, eighteen hundred and sixty-nine, seven days before the petition in bankruptcy was filed. "Elizabeth Dreisbach and Martin Dreisbach, her husband, for the

use of the said Elizabeth Dreisbach v. William Dreisbach. Fi. fa. No. 712, S. T., 1869. R. D. $2,380 08," by virtue of which the sheriff levied on all the personal property of the defendant at the store aforesaid on the eighteenth day of October, eighteen hundred and sixty-nine, four days before the petition in bankruptcy was filed. "Martin Dreisbach v. William Dreisbach. Fi. fa. No. 713, S. T. 1869. R. D., $1,933 45," by virtue of which the sheriff levied on all the personal property of the defendant at the store aforesaid, on the eighteenth day of October, eighteen hundred and sixty-nine, four days before the petition in bankruptcy was filed. Pending the meetings before the register, on application of the assignee in this case, the execution of Elizabeth Dreisbach, was, on October twenty-second, eighteen hundred and seventy, set aside and her claim by virtue of said execution abandoned.

The acts of bankruptcy alleged in the original petition in this case, were the fraudulent suspension and non-resumption of payment of their commercial paper by the bankrupts within a period of fourteen days, and the assignment or transfer by said bankrupts, trading as Dunkle & Dreisbach, on the twenty-ninth day of July, eighteen hundred and sixty-nine, of the stock of goods and credits of the said firm—the stock of goods having been contained in their store at No. 140 North Eighth street, in the city of Philadelphia—to William Dreisbach, one of said bankrupts, with intent to defeat and delay the creditors of said firm; and in an amendment to said petition, the procuring or suffering by said William Dreisbach, with the further intent to defraud the petitioning creditor, and to give a preference to two of his private creditors, his father, Martin Dreisbach, and his mother, Elizabeth Dreisbach, the said stock of goods to be taken on legal process, viz., under executions issued out of the district court for the city and county of Philadelphia, to September term eighteen hundred and sixty-nine, numbers seven hundred and twelve and seven hundred and thirteen, upon judgments obtained by the said William Dreisbach and the said Elizabeth Dreisbach, of Lewisburg, Pennsylvania, the suits upon which the said judgments were obtained having been brought on the second day of October, eighteen hundred and sixty-nine, after protest of the notes held by the petitioning creditor, the said William Dreisbach having suffered judgment thereon to be obtained for default of appearance, though in suits brought against him by other persons at or about the same time, he caused appearance to be entered, and though even if the said claims had been just ones, which the petitioner did not admit, judgment could not have been adversely obtained for some time thereafter. On the twenty-fourth of November, eighteen hundred and sixty-nine, a decree of adjudication of bankruptcy was made, wherein it was found that the facts set forth in the petition were true.

It is important to consider in the first place whether said decree is conclusive evidence as against Martin Dreisbach, the present claimant, of the allegations in the petition and amendment thereto, or whether, under the order of the circuit court referred to, the question of priority of lien or payment of said claimant is to be considered independently of any proceeding to which he was not directly a party; for if such decree be so conclusive, it would only be necessary to consider as to two of said claims whether the claimant had reasonable cause to believe that the bankrupt or bankrupts were insolvent and that a fraud on the bankrupt act was intended.

In the case of Shawhan v. Wherritt, 7 How. [48 U. S.] 627, it was held by the supreme court of the United States that a decree of a district court of the United States sitting in bankruptcy (referring to the bankrupt act of eighteen hundred and forty-one) whereby a person proceeded against in invitum was declared to be a bankrupt, was sufficient evidence as against those who were not parties to the proceedings to show that there was a debt due to the petitioning creditor; that the bankrupt was a merchant or trader within the meaning of the act, and that he had committed an act of bankruptcy. But it may be doubted whether such would be the case in regard to a decree of adjudication of bankruptcy made under the act of eighteen hundred and sixty-seven, which does not, as does the act of eighteen hundred and forty-one, provide that notice of a creditor's petition should be published at least twenty days before the hearing, that all persons interested might appear and show cause why the prayer of the petitioner should not be granted; for, said Grier, J., in delivering the opinion of the court, "The public notice required by the act having been given, the creditors must be treated as having notice of the proceedings and an opportunity to make their objections to them, and having neglected or refused to do so, they ought not to be allowed to impeach them collaterally, as they are in the nature of a proceeding in rem before a court of record having jurisdiction. Even if the record in the bankruptcy court be not conclusive as against the defendants, it is at least prima facie evidence that all facts necessary to sustain the decree were proved before the court," and it was added, "and lastly the record of the case shows sufficient evidence to sustain the decree on all points."

In Re Schick [Case No. 12,455], Blatchford, J., in making the adjudication of bankruptcy, said: "This proceeding, however, is so far one merely between the petitioning creditors and the debtor. Cowen, (the party to whom the confession of judgment by the bankrupt was found to be an act of bankruptcy,) is no party to it, although examined as a witness for the debtor, and, in the further progress of the matter, if the assignee of the debtor to be appointed should institute proceedings

to realise for the benefit of the debtor's estate in bankruptcy, the property levied on by the sheriff under the execution, Cowen will have a full opportunity to assert his rights and maintain, if he can, the integrity of the judgment, and there is nothing in this adjudication to preclude him from so doing."

In Re Drummond [Id. 4,093], it was said by McDonald, J., in making the adjudication of bankruptcy, "a preference being the act of bankruptcy, and indeed, as the preferred creditors are not parties to this proceeding, it would be unjust that the present decision should in any manner affect their interest, excepting so far as it fixes the status of Drummond as a bankrupt."

In Re Dibblee [Id. 3,884], Blatchford, J., in his charge to the jury, an issue having been demanded as to the commission of the acts of bankruptcy by the alleged bankrupts, one of which was suffering their property to be taken in execution, &c., says: "You are not now in any manner trying the question whether Iselin & Co. (alleged preferred creditors) shall be compelled to refund what money they received, or whether Mrs. Krauss (another alleged preferred creditor) shall be compelled to refund the money and securities which she received. These questions are not at all involved here. If these debtors shall be déclared bankrupt, and the assignee shall be appointed and he shall bring an action against Iselin & Co., and an action against Mrs. Krauss, nothing that has transpired here, neither your verdict nor the adjudication of the court, if your verdict should be in favor of the creditors, will in any manner whatever determine or affect any question that will be involved in any such suit."

In Re Goodfellow [Id. 5,536], a voluntary case, Lowell, J., held that the adjudication was not conclusive as to a fact which went to defeat the jurisdiction of the court over the supposed bankrupt, saying: "No doubt the petition is conclusive evidence that the debtor is insolvent and decides to take the benefit of the act, and perhaps the fact that he owes three hundred dollars may be conclusively found by the adjudication, but upon a fact which goes to defeat the jurisdiction of the court over the supposed bankrupt, it cannot be so. Such a fact as that may be shown by plea and proof in any court by a person not estopped to show it, and it cannot be that the only exception is of the court in which the void proceedings themselves are pending; nor is the adjudication binding as a judicial decree, which must be impeached, if at all, in a higher court. It is made ex parte, without notice to creditors, and is entirely under the control of this court, upon due proof that it ought to be annulled, at least at this stage of the cause."

On the other hand, in Re Beck [Id. 1,205], the register having submitted an affidavit of one James H. Beck, an alleged lien creditor, and certified the question whether the facts set forth in the affidavit constituted an act of bankruptcy so as to displace the lien of the execution of said creditor and prevent him from claiming the proceeds of the sale of the goods levied upon, your honor said: "If the register had reported the facts, instead of the evidence of them, the certificate would, perhaps, be more regular; but I could not have answered the question in its present form. They may have constituted an act of bankruptcy on the part of the debtor, without necessarily depriving the execution creditor of his lien; because the bankrupt may have intended to give a preference without the creditor's knowledge or intention being such as to implicate him. In the present case, the adjudication of bankruptcy, may, for aught that I recollect, have been pronounced upon the transaction with John O. Beck, without any intimation of an opinion as to the transaction with James H. Beck. The petitioning creditor alleged that the warrant to confess judgment given to James H. Beck, was an act of bankruptcy, and further alleged that the bankrupt procured the property to be taken in execution by the creditor. The latter allegation was that of a distinct act of bankruptcy, which if committed, can scarcely have been committed without the creditor's privity." This would seem to imply that if the adjudication had been pronounced upon the transaction with James H. Beck, it would have been competent evidence as against him in determining the question of his priority of lien; but as the matter then under consideration was more particularly the proper method of investigating the alleged claim of priority, such an implication may be unwarrantable. On the whole, therefore, I am inclined to the opinion that the adjudication in this case does not establish as against the claimant the facts alleged in the petition. It may not be immaterial, also, to consider the effect in this conclusion of the proof of two debts by the claimant against the estate.

It is to be further remarked that if the adjudication avoids the transfer of the partnership assets, in this case, to William Dreisbach, one of the partners, and so far is in the nature of a decree in rem, the execution of the claimant against said William Dreisbach alone, would only be entitled to priority of payment out of so much of the funds in the hands of the assignee as were produced by the sale of the goods levied upon, and which were acquired by said William Dreisbach subsequent to the twenty-eighth day of July, eighteen hundred and sixty-nine, the time of the alleged transfer, and which were not in any way the proceeds of property belonging to the partnership at that time; and perhaps this effect may be conceded to the adjudication, as against the claimant, without any violation of the maxim, "Res inter acta alteri noceri non debet." But however this may be, I will proceed to consider the claims of Martin Dreisbach only upon the testimony referred to as having been taken before me.

The partnership of Dunkle & Dreisbach, (composed of Oliver R. Dunkle and William Dreisbach,) was formed on the seventh day of September, eighteen hundred and sixty-eight, for the purpose of selling dry goods, at No. 140 North Eighth street, in the city of Philadelphia. Dreisbach having purchased the interest of James McCurdy in the firm of J. C. McCurdy & Co., (or as it was also called in the testimony McCurdy & Dunkle,) who had been carrying on the the dry goods business at said place, contributed said purchase as two-thirds of the capital stock, Dunkle to furnish the other one-third. The profits and losses were to be shared in the proportion of three-fifths by Dreisbach and two-fifths by Dunkle. The partnership was to continue two years. As to what consideration Dunkle gave, or was to give, for the one-third interest in the capital stock which he proposed to contribute, or what was his interest in the former firm of J. C. McCurdy & Co., does not appear to have been known to Dreisbach at the time of the formation of the partnership with him. Dunkle, however, appears as against McCurdy "to have waived his right," as he states it, to any interest in the firm of J. C. McCurdy & Co., and was to pay McCurdy one-third of twenty-five thousand dollars, that being the valuation of the stock as by an account taken at the time of the succession of Dunkle & Dreisbach to J. C. McCurdy & Co., or McCurdy & Dunkle. This sum was paid by Dunkle, without the knowledge of Dreisbach, by giving to McCurdy four notes drawn by Dunkle & Dreisbach to the order of Dunkle and by him endorsed, said notes being for about the following amounts: one thousand dollars, one thousand one hundred and thirty-seven dollars and twenty-six cents, three thousand one hundred and six dollars, two thousand two hundred and fifty-one dollars. Dreisbach's interest, about seventeen thousand dollars, appears to have been paid for principally by moneys borrowed from his father and wife, four thousand dollars thereof appearing to have been, or to have become represented by a note to become due January first, eighteen hundred and seventy, endorsed by his father. On the twenty-eighth day of July, eighteen hundred and sixty-nine, Driesbach having first learned of the issuing of the notes for one thousand dollars and one thousand one hundred and thirty-seven dollars and twenty-six cents in the firm name by Dunkle, from the fifteenth to the twentieth of July of that year, an agreement of dissolution was entered into, by which Dunkle, in consideration of the payment of three thousand one hundred and forty-eight dollars and twenty-eight cents, viz.: by the payment by Dreisbach of the two notes last mentioned and the balance on it before January first, eighteen hundred and seventy, sold to Dreisbach all his interest in the firm, he, Dunkle, agreeing by good and sufficient security to secure Dreisbach against the payment of any and all notes. bills of exchange or other obligations given by him, Dunkle, in the firm name for any individual debt, and that he would not engage in the retail dry goods business in the city of Philadelphia, nor be employed in any dry goods store in said city for the period of two years, two thousand dollars being agreed upon as stipulated damages for the violation of said last-mentioned agreement of Dunkle not to engage in the dry goods business, &c. Dreisbach also thereby agreed to pay all partnership debt, and by good and sufficient security to indemnify said Dunkle therefrom, except such partnership notes, bills, or other obligations, not therein specified, that had been or might be given by said Dunkle for his individual debts.

At the time of this agreement the amount of indebtedness of the partnership was as follows:

| | | |
|---|---:|---:|
| Outstanding accounts for goods bought | $ 3.515 | 98 |
| Bills payable for goods bought.... | 5,809 | 49 |
| And the notes given by Dunkle in the partnership name and which were then known to Dreisbach... | 2,137 | 46 |
| | $11,462 | 73 |
| To which must be added the two other notes given by Dunkle in the firm name, but which were then unknown to Dreisbach, but of course known to Dunkle, $3,106 and $2,251 60............ | 5,357 | 60 |
| | $16,820 | 33 |
| At this time Dreisbach estimates the stock to have been worth.... | $20,000 | 00 |
| The estimate he stated, however, was not founded "either on cost prices or positive values, but to be a mere estimate." | | |
| Outstanding credits............. | 1.405 | 25 |
| Cash ...................... | 556 | 36 |
| | $21,961 | 61 |
| Dreisbach's individual indebtedness at that time appears to have been to his father or J. C. McCurdy (his father having become his surety therefor by endorsement) ................. | $ 4,000 | 00 |
| To his father for money loaned (for $8,570 of which his father had a judgment note, dated about 1st of March, 1869, a time when the firm does not appear to have been in insolvent circumstances or to have contemplated such a state, but at the time of said agreement no judgment had been entered upon it)............. | 10,503 | 45 |
| To his wife for money loaned (used in part payment for his interest in the partnership)............ | 2,000 | 00 |
| | $16,503 | 45 |

There are also firm notes to the amount of one thousand five hundred and forty-seven dollars and thirteen cents, which his father appears to have paid or to have become liable for, but whether they are included in the statement of bills payable due by the firm does not appear.

Dreisbach's separate property consisted of a mortgage on land in Minnesota for $1.000, but from which he states he subsequently received .................... $ 964 00

And his household furniture, valued in the appraisement in these proceedings at................ 208 25

$ 1,172 25

Dunkle's individual indebtedness (not including that for which the firm notes referred to were given), as returned in his schedule is one hundred and sixteen dollars and fifteen cents; what it was at the time of the said agreement does not appear. He alleges that he had, at the time of the purchase from McCurdy, Western Union Telegraph stock, Western Pennsylvania Railroad bonds, and United States bonds, altogether valued at two thousand five hundred .dollars, but from which he only realized about two hundred and ninety-four dollars; but his statements as to this separate property are very confused, and it does not appear what was the value of that in his possession, if any, at the time of his agreement. His only property returned in his schedules, consists of household furniture, valued by the appraisers in these proceedings at three hundred and twenty dollars and fifty cents. The sum agreed by Dreisbach in this agreement of the twenty-eighth of July, eighteen hundred and sixty-nine, to be paid to Dunkle, was arrived at. not by taking an account of stock, but by an appraisement of the net profits taken from the books and adding Dunkle's share to the credit of his account after deducting what he had drawn out.

The amount of capital to the credit of Dreisbach on the books at that time was................... $12,833 14

To the credit of Dunkle $2,795 29. His share of appraised profits $290 ..................... 3.085 29

The securities stipulated for in the agreement were not given by either party thereto, there being a dispute as to the sureties, Dreisbach having tendered a bond with his father as surety and Dunkle one with a person as surety whom Dreisbach was not willing to accept, alleging that Dunkle had agreed to procure certain other persons as sureties. After the twenty-eighth day of July, eighteen hundred and sixty-nine, Dreisbach carried on the business in his own name, notice of the dissolution of partnership being published in the Philadelphia Public Ledger of the twenty-ninth of July of that year; that all debts due to and from the said firm of Dunkle & Dreisbach would be settled by Dreisbach, and sent to every party whose name was on the books of the said firm, and from whom goods had been bought. The signs of the partnership at the store, however, (with the exception of those on the window sills, which were taken away,) remained as before, but it does not appear that any debts are now due for goods

purchased by Dreisbach after this time, which are claimed by creditors to have been sold on the credit of an existing partnership. On the first of September, eighteen hundred and sixty-nine, an account of stock was taken which amounted to seventeen thousand five hundred and ninety dollars and eighty-seven cents. On or about the thirteenth of August previous, Dreisbach had borrowed from his mother nineteen hundred dollars U. S. bonds, the market value being about two thousand three hundred and fifty-six dollars and fifty-two cents. On the first of September following he first learned of the note for three thousand one hundred and six dollars given by Dunkle as before stated, and the following week the one for two thousand two hundred and fifty-one dollars. On the eighteenth of September, eighteen hundred and sixty-nine, three suits were commenced against him in the district court for the city and county of Philadelphia, as follows: By Elizabeth Dreisbach and Martin Dreisbach, her husband, (his mother and father,) to the use of said Elizabeth Dreisbach. Number eight hundred and ninety-four, September term, eighteen hundred and sixty-nine. By Caroline M. Dreisbach, (his wife,) by her next friend, Martin Dreisbach. Number eight hundred and. ninety-five, September term, eighteen hundred and sixty-nine. By Martin Dreisbach. Number eight hundred and ninety-six, September term, eighteen hundred and sixty-nine. The writs therein were issued September eighteenth, eighteen hundred and sixty-nine, returnable the third Monday of September. William J. McElroy, Esq., one of Dreisbach's solicitors in this proceeding, and whom he appears to have consulted before this time in relation to his affairs, was the attorney for the plaintiffs. A return of nihil habet was made to each writ, but on October second following, alias writs in these suits were issued returnable the first Monday of October, which were duly served and judgments taken on the suits of Dreisbach's father and mother, but not on that of his wife, for want of an appearance. In these alias writs Samuel H. Orwig, Esq., one of the counsel for the present claimant, appears as attorney for the plaintiff. Executions were subsequently issued on these judgments, as before stated, as also upon a judgment for eight thousand five hundred and seventy dollars, (the judgment note before referred to having been entered up on the thirteenth day of October, eighteen hundred and sixty-nine, in said district court of Philadelphia,) and upon a judgment of Bush, Bunn & Co., against Dunkle & Dreisbach recovered October ninth, eighteen hundred and sixty-nine, but which had been purchased by the claimant and marked to his use October eleventh, eighteen hundred and sixty-nine.

From the first discovery of the notes given by Dunkle for his purchase from McCurdy. Dreisbach appears to have kept his father.

the present claimant, fully advised as to the state of his affairs, both by letter and personal communication, he having been in Lewisburg where his father resided shortly after the agreement of July twenty-eighth, eighteen hundred and sixty-nine, and his father having been in Philadelphia in September following. The object of his visit to his father was to obtain his signature to the bond as surety, stipulated to be given by him in said agreement, and also to get his father to "sign note" to be used in carrying out said agreement. The father appears to have signed a bond for ten thousand dollars and notes to the amount of two thousand dollars. At this time the partnership difficulties were explained to the father. In September, having informed his father of the other notes given by Dunkle, viz.: those for three thousand one hundred and six dollars and two thousand two hundred and fifty-one dollars, and that he thought it would cause trouble, his father came to Philadelphia to consult an attorney about his interests. His son then informed him, or had done so previously, that he (the son) had employed Mr. McElroy. Mr. Orwig, whom the father desired to consult, being out of town, he, in company with his son, went to Mr. McElroy's office. This, however, the father does not appear to have done for the purpose of consulting Mr. McElroy himself, but merely in company with his son, who desired to see Mr. McElroy on his business; but the father states that while there, he thinks he did state something about his matters. When the father was in Philadelphia he stayed at his son's house, and his son generally accompanied him in the transaction of any business. There can be no doubt, therefore, that the father was fully aware of the son's financial condition, and he admitted "that if he had not received word from his son that he was in trouble, he would not have entered up his judgment, and that it was in consequence of what his son communicated to him that he entered up his judgment," because his son had informed him that there was a lot of firm notes that he had not known of, and it might make trouble—that otherwise he should not have thought of it. After the executions were issued, the father was again in the city. During this visit, he states, he thinks that his son was present with him when he saw one of the deputy sheriffs, and that he talked somewhat about the son's affairs, and he thought maybe the object of this interview with the deputy sheriff was to make arrangements to secure a quiet sale of the personal property without any exposure. In this the son alleges that his father was mistaken, and the two deputies of the sheriff to whom the executions appear to have been intrusted, deny that they ever had any communication with the claimant. By the testimony also of the deputy sheriff by whom the levies were made, it appears that an inventory of

the stock in the store was made by the son, (in which the stock is valued at eight thousand two hundred and sixty-four dollars and three cents, and the outstanding credits at two thousand and forty-eight dollars and forty-three cents;) that no watchman was placed upon the premises, and the defendant was allowed to sell as in the ordinary course of business—he promising to account for such sales to the sheriff. To the defendants thus selling no objection was made on behalf of the execution creditors, whose counsel was informed of what the deputy sheriff had done. The sheriff's sale was adjourned from time to time, after notice of the injunction by the circuit court was served, until the taking possession by the marshal as messenger. By a memorandum in the inventory just referred to, there appears to have been sales made pending the levy to the amount of three thousand four hundred and twenty-four dollars and forty-nine cents.

| | |
|---|---:|
| The total amount received by the assignee arising from sale of stock, by his account, is........ | $ 8,502 34 |
| Collection of book accounts....... | 552 12 |
| Book accounts unpaid at the time of filing account by assignee, June 6, 1870................... | 359 76 |

Having thus stated the facts as developed by the testimony, I propose first to consider whether the agreement of July twenty-eighth, eighteen hundred and sixty-nine, was directly or indirectly a procurement to have property attached or taken on legal process within the meaning of the thirty-fifth or thirty-ninth sections of the bankrupt act; for said agreement was certainly not a transfer, assignment, or conveyance, (if it operated as such at all,) directly to the present claimant. I see no reason to doubt that the object of Dreisbach in making this agreement was to free himself from a partner, who at the very commencement of the business had been guilty of a most flagrant breach of good faith, and in so doing, to protect himself against the consequences of his partner's act, but at the same time to provide for all obligations of the partnership then known to him. Even taking into consideration the obligations upon all the notes given by Dunkle, (and whether these notes were really such would of course depend upon the bona fides, with which they had been received by their holders,) it does not appear that the partnership was at that time actually insolvent. It is true that Dreisbach's separate indebtedness was very large, but his separate creditors were not only not pressing for payment, but their assistance was such as to leave no doubt of its object; for from one of them, his father, he obtained the security stipulated to be given by the agreement, and his signature to notes to help him carry out the provisions thereto, and from another, his mother, he subsequently obtained the sum of two thousand three hundred and fifty-six dollars and fifty-two cents. Such a state of facts seems to me altogether inconsistent

with an intention on the part of Dreisbach at the time of this agreement to render the partnership assets his separate property, in order that they might be taken in execution for the debts due his father, for if the securities had been exchanged as contemplated by the agreement, his father would have become liable for all firm indebtedness, other than that which had been incurred by Dunkle for his individual benefit, part of which also, viz., the notes for one thousand one hundred and thirty-six dollars and twenty-seven cents, and one thousand dollars his father would have become liable for; for he signed or endorsed two notes with which his son expected to provide therefor. The security to be given by Dunkle was to provide for any other notes given by him for his individual indebtedness in the partnership name. Of course the intention of Dunkle in making the agreement could not have been to procure the partnership assets to be disposed of for the benefit of Dreisbach's separate creditors. I feel, therefore, constrained to answer this question in the negative.

I proceed next to inquire, whether subsequently to the agreement, there was such a procurement to have his property taken on legal process, on the part of Dreisbach, (for subsequently to this time Dunkle appears not to have had any connection with the business,) as is contemplated in said sections of the bankrupt act. That there was such procurement, I think there can be no reasonable doubt, if due effect be given to all the circumstances attending the relations of the claimant with his son from the first discovery by the son of the notes for three thousand one hundred and six dollars, and two thousand two hundred and fifty-one dollars, early in September, about the first or second week thereof. His father alone of all his creditors was fully informed as to his business. The expressions made use of, that it was thought that these notes would cause trouble, &c., have been before fully stated and need not be here repeated. The same attorney who had been consulted by the son brings three suits against him. Service is not made of the original writs in these suits, but alias writs are subsequently issued by another attorney. It is reasonably inferred that the object of issuing the alias writs was to disconnect the action of the claimant from that of his son. To the alias writs no appearance was entered; judgment was obtained for want of appearance, and executions immediately issued. Then the conduct of the defendant in the executions was certainly such as to oppose no obstacle in the way of his father. The succession of events in this respect has been before fully stated. That the claimant had reasonable cause to believe that his son was insolvent is clearly evident. The claim, by virtue of the execution issued on the judgment purchased from Bush, Bunn & Co., it is contended, is in a different position from that of the

others. But however it would have been in the hands of Bush, Bunn & Co., I think it must, in the hands of the claimant, share the same fate as the other alleged liens, for the purpose for which it was purchased was to subserve the interests of the others. The testimony of the claimant in this respect is as follows: "Mr. Orwig, my counsel, drew on me for the amount; I paid it at the Lewisburg National Bank on his draft. Mr. Orwig stated this was the only judgment ahead of mine, and I had better pay this judgment, then I would have the first claim. Mr. Orwig suggested that I had better do this. It was through his suggestion I agreed to pay the judgment." Even if as to it, there was no procurement on the part of Dreisbach, the bankrupt, to have his property seized thereon, I am of opinion that he suffered his property to be taken in execution thereon within the meaning of the thirty-ninth section referred to. And this brings me to consider another question, viz.: whether, (and this as to all the claims,) if the circumstances before stated did not amount to a procurement to take in execution, they were not a suffering so to be taken within the provisions of said thirty-ninth section.

In Re Black [Case No. 1,457], Blatchford, J., uses the following language: "In regard to the question of suffering property to be taken on legal process. There was no such language in the act of eighteen hundred and forty-one. It was by the first section of that act made an act of bankruptcy for a person to willingly or fraudulently procure his goods to be taken in execution. The word 'suffering' in this connection was not used in the act of eighteen hundred and forty-one. There is a clearly recognised legal distinction between 'procuring' and 'suffering.'" The act of 6 Geo. IV. c. 16, § 3, provides, that if any trader should suffer himself to be arrested for any debt not due, or suffer himself to be outlawed, or procure himself to be arrested, or his goods, money or chattels to be attached, sequestered or taken on execution, he might be brought into bankruptcy. In Gibson v. King, Car. & M. 458, a creditor had brought an action against the bankrupt for a debt, and judgment had been suffered to go by default, and no execution had been issued on it on which the bankrupt's goods had been taken, and the question arose whether suffering the judgment to go by default in the action, and suffering the goods to be taken on the execution in the judgment, was procuring the goods to be taken in execution within the statute. The court held, that the bankrupt had suffered the goods to be taken in execution, but had not procured them to be so taken. The same view of the distinction between the two words in the English act was taken in Gore v. Lloyd, 12 Mees. & W. 463. The distinction there maintained by Baron Alderson, was, that the bankrupt procured his goods

to be taken in execution, when the initiation of the proceedings came from him, when he was the person who began to procure, when he caused the thing to be done in the ordinary sense of the word; but that the signing, reluctantly, under strong pressure from a creditor for a warrant to confess judgment under the stipulation that the warrant should not be unnecessarily put in force, was suffering, and not procuring goods to be taken in execution, which were taken on the execution issued upon the judgment entered upon the warrant. The English and other decisions as to pressure by a creditor, and as to what it is to procure, have no application to the question of suffering. Denny v. Dana, 2 Cush. 160. Congress, in view of the provisions of the act of eighteen hundred and forty-one and of the decisions of the supreme court under it in regard to the meaning of the words "procure" and "suffer," and in regard to the effect of pressure or suit by a creditor upon the question as to whether the debtor procures to be done the act, which secures the preference to the creditor, must be regarded as having intended, by the use of the words "insolvency" and "contemplation of insolvency" and "suffer" in the connection in which they are found in the act of eighteen hundred and sixty-seven, to strike at the root of all preferences obtained by a creditor, when his debtor is insolvent or in contemplation of insolvency by the taking of the debtor's property on legal process, whether the taking be by an act of procurement or on an act of sufferance on the part of the debtor, where there is an intent on the part of the debtor to give such preference and the creditor has reasonable cause to believe that the debtor was insolvent. In Re Craft [Case No. 3,316], the same judge, in affirming the decision of the last case, says: "Suffering property to be taken on legal process. This was added for a purpose and with an intent. To say that there can be no suffering when there is pressure by a creditor, is to destroy the plain meaning of the words. To suffer or permit implies pressure and action from without. Pressure being thus an inherent element of sufferance, to say that when there is pressure there can be no sufferance, is to utter a fallacy. Where a person permits what he can prevent, he suffers or allows the thing to be done whether he is threatened or pressed or not. A debtor who is threatened or pressed, can prevent the taking of his property on legal process by going into voluntary bankruptcy. If he does not, he clearly suffers or allows or procures the taking." The allowance of an amendment to the petition in this case was afterwards affirmed in the circuit court by Nelson, J. [Id. 3,317], but the principle of the decision as to suffering property to be taken on legal process does not appear to have been considered.

In Re Dibblee (before cited), Blatchford, J., in his charge to the jury, held, that if a debtor was insolvent or contemplated insolvency at the time of a levy by an execution creditor, and refrained from going into voluntary bankruptcy, it was suffering property to be taken on legal process, and if he knew that he was insolvent or contemplated insolvency when so suffering property to be taken in execution in a manner that necessarily resulted in giving a preference to the execution creditor, then he intended such preference in judgment of law, and committed an act of bankruptcy. In Re Wells [Case No. 17,388], the same doctrine is held by Baldwin, J., of the district of Nevada, and again by Blatchford, J., in Hardy v. Clark [Id. 6,058], and also in Re Davidson [Id. 3,599]; by Drummond, J., in Campbell v. Trader's Nat. Bank of Chicago [Id. 2,370]; and by Miller, J., in Re Terry [Id. 13,835]. In Re Davidson, just referred to, the objection that under this principle of decision, an insolvent debtor who has not committed any act which would subject him to be proceeded against as an involuntary bankrupt, might practically set his creditors at defiance, because they would be deterred thereby from taking his property on legal process, and no remedy would be open to them; it was answered, that as the penalty upon a creditor provided for by the thirty-ninth section, of not being allowed to prove his debt in bankruptcy, is enforceable against him only in case he compels the assignee to resort to legal proceedings to recover the property transferred in violation of the act,—citing In re Montgomery [Id. 9,728],—the creditor may proceed, and after taking the property of his debtor on legal process, can himself throw his debtor into bankruptcy for that act, and can then voluntarily turn the property over to the assignee. But in Re Kerr [Id. 7,728], it was held by Krekel, J., that creditors holding judgment may order execution to issue, and levy upon and sell the property of their debtors, and the bankrupt law will protect them in the advantage thus secured, although they may have had at the time of ordering execution, doubts as to the solvency of the debtor. This last case, although it may be an authority against the general doctrine of the preceding cases, is very different in its circumstances from the one under consideration. I am therefore of opinion that William Dreisbach, being insolvent, suffered his property to be taken on legal process with intent to give a preference to his father, Martin Dreisbach, who had reasonable cause to believe that his son was insolvent and intended to give such preference, and thereby commit a fraud on the bankrupt act, and that the claims of Martin Dreisbach to priority of payment out of funds in the hands of the assignee should be disallowed.

After reading the foregoing report at an adjourned second general meeting of creditors, held on the second day of November, eighteen hundred and seventy, Mr. Orwig, of counsel for the claimant, stated that he de-

sired to take the deposition of Mr. McElroy in regard to the issuing of the writs by him in the three suits referred to. At·an adjourned second general meeting of creditors, held on the ninth day of November, eighteen hundred and seventy, said ·deposition was taken and is forwarded with the other testimony. The explanation given by Mr. McElroy, and the admissions in behalf of the assignee, would seem to invalidate the inference that the alias writs in these suits were issued for the purpose of disconnecting the action of the claimant from that of his son, but this additional testimony does not, in my opinion, weaken, but strengthens the evidence of procurement by William Dreisbach to have his property taken on legal process. I therefore see no reason to change the conclusion to which I have already come.

Exceptions of Martin Dreisbach to the foregoing report of the register:

1. To all that part of the report which assumes the right of the circuit court of the United States to enjoin against the execution of writs of fieri facias issued out of a state court of competent jurisdiction, and while the record in the state court remains unimpeached.

2. To the conclusion that Martin Dreisbach is responsible for the issuing of writs of summons by William J. McElroy, Esq., attorney for William Dreisbach, and, therefore, not entitled to the lien of his executions adversely procured in suits brought by his (exceptant's) counsel.

3. To the conclusion that if William Dreisbach, without the knowledge of his father, Martin Dreisbach, attempted to procure his (William's) property to be taken in execution for his father, which attempt, if made, entirely failed, yet, therefore, Martin Dreisbach is not entitled to the benefit of his executions adversely procured by his (exceptant's) counsel.

4. To the conclusion that Martin Dreisbach had no right to issue executions against his son, William Dreisbach, because he, Martin Dreisbach, knew that William was "in trouble" in consequence of Oliver R. Dunkle having fraudulently issued the notes of Dunkle & Dreisbach to pay his (Dunkle's) private debts.

5. To the conclusion that the execution of Bush, Bunn & Co., for the use of Martin Dreisbach against Dunkle & Dreisbach, is not entitled to priority of payment.

6. To the general conclusion that this exceptant, who is the plaintiff in said executions, has not the right to priority of payment by virtue of said executions.

After argument by Messrs. Orwig & Pollock on behalf of Martin Dreisbach, and Messrs. Morgan, Penrose & Jenkins for assignee and creditors, the court, Cadwalader, J., on December twenty-first, eighteen hundred and seventy, made the following provisional order: "If Martin Dreisbach desires an immediate decision upon his exceptions in order to obtain a revision by appeal or certificate, the exceptions will be dismissed and the claim of this creditor rejected; but of the matters not thus pressed the court will suspend its final decision as to this creditor until definitive adjudication as to the proofs on the notes of which the consideration between the original parties may be inquired or questioned."

Orwig & Pollock, for Martin Dreisbach.

Morgan, Penrose & Jenkins, for assignee and creditors.